## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DAVID PINA, et al.,                              :
                                                 :
            Plaintiffs,                          :     NO. 3:04CV1574 (MRK)
v.                                               :
                                                 :
THERESA C. LANTZ, et al.,                        :
                                                 :
            Defendants.                          :

## <u>MEMORANDUM OF DECISION</u>

In this case, ten current and former employees of the Connecticut Department of Correction ("DOC") sue Theresa Lantz, the Connecticut Commissioner of Correction, as well as various administrators of both the DOC and the Connecticut Department of Administrative Services ("DAS"), for alleged violations of their constitutional and statutory rights when Defendants terminated Plaintiffs from their positions as Correctional Officers First Class and Correctional Sergeants, and failed to hire them for a newly-created position of Parole Officer I. More specifically, Plaintiffs contend that Defendants violated their rights to substantive due process, procedural due process, and equal protection of the laws under the Fourteenth Amendment, as well as their rights under Title VII of the Civil Rights Act of 1964.[1]

Following the close of discovery, Defendants have now moved for summary judgment, arguing that Plaintiffs' positions as Correctional Officers First Class and Correctional Sergeants were temporary positions in which Plaintiffs did not have a property interest, and that, in any event,

---

[1] In her Motion in Opposition to Summary Judgment, Plaintiff Patricia McCardle stated that she was no longer pursuing her claim under the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60, *et seq. See* Mot. in Opp'n to Summ. J. [doc. # 98] at 26 n. 13. The Court therefore grants summary judgment to all Defendants on Ms. McCardle's CFEPA claim.

Defendants had legitimate, non-discriminatory reasons for not hiring Plaintiffs for the Parole Officer I positions. For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [doc. # 86] and DENIES AS MOOT Plaintiffs' Motion to Strike [doc. # 108].

## I.

The allegations in this case arise out of actions taken by Defendants in 2003 and 2004. The Court will provide a brief recitation of the facts at this point, and will discuss the facts in greater detail in the context of each claim. As is required, the Court relates the facts in the light most favorable to Plaintiffs.

In 1998, the DOC initiated a pilot program out of its New Haven office in which Correctional Officers ("COs") would assist Correctional Counselors in monitoring inmates making the transition back into the community. The DOC later expanded the pilot program to its Bridgeport, Norwalk, Stamford, and Waterbury offices. As part of this pilot program, the DOC and the DAS developed two new job classifications for COs who were assigned to the program: CO First Class and Correctional Sergeant. At the time the DOC announced the new job classifications, the DOC labeled the positions as "durational," meaning that they were not permanent positions and that they would expire in eighteen months. In addition, the DOC described both positions as "temporary service in a higher class," indicating that selected applicants would receive a pay raise in their new positions. When the durational positions expired, assuming that they were not made permanent, the DOC expected that durational employees would return to their originally-held CO positions.

In the fall of 1999, Plaintiffs Gaetano Balsamo, Wilmore Evans, David Pina, Guy Smith, and Lippidio Torres accepted CO First Class positions. At the same time, Plaintiffs Rene Figueroa and

Sandra Lavoie-Francisco[2] accepted Correctional Sergeant positions.  Plaintiffs Preston Wales and Gino Caccavale received appointments to the CO First Class position in January and February 2002, respectively.

Nearly four years after the original appointments, in August 2003, the Connecticut General Assembly passed a statute that merged the DOC with the Connecticut Board of Pardons and Parole. As a result of this merger, Commissioner Lantz established (in September 2003) a transitional committee to review each department's positions.  After receiving the committee's report, the DOC elected to establish a new position–Parole Officer I ("PO I")–which would encompass the duties previously performed by the individuals in the positions of CO First Class and Correctional Sergeant. Thus, following the selection of candidates for the PO I position, the DOC intended to terminate the CO First Class and Correctional Sergeant positions.  As PO I was a new job classification, the DOC required anyone interested in the PO I position to formally apply for it, even if they had previously served as a CO First Class or Correctional Sergeant.  The DOC published the PO I position's job description along with the minimum qualifications necessary for the job, which included having at least six years of experience in parole case management activities.  However, as stated in the published job listing, the DOC would allow applicants to substitute a portion of the job experience requirement with a specified quantity of academic units in relevant fields of study.

The DOC received 214 applications and eventually made 59 offers for the initial pool of PO I positions.  All of the Plaintiffs applied for the PO I position, including Plaintiff Patricia McCardle, who at the time held the position of Corrections Counselor, rather than either one of the durational

---

[2]  Ms. Lavoie-Francisco is also referred to in the record as Ms. Murdoch and Ms. Zerjav.  To limit any confusion, the Court will refer to her in this opinion solely as Ms. Lavoie-Francisco.

positions. Maria Guglielmi, a Personnel Officer with the DOC, and Defendant Brenda Abele, a DOC Principal Human Resources Specialist, reviewed all applications, including Plaintiffs', and determined whether each applicant met the minimum job requirements and therefore should be scheduled for an interview. Of the 214 applicants, Ms. Guglielmi and Ms. Abele concluded that 107 of the applicants satisfied the minimum requirements for the job and thus warranted an interview. Except for Ms. McCardle, Ms. Guglielmi and Ms. Abele initially concluded that all of the remaining Plaintiffs lacked the minimum experience required for the PO I position. As a consequence, none except Ms. McCardle were scheduled for an interview. Mr. Balsamo appealed the decision of Ms. Gugliemo and Ms. Abele that he did not meet the minimum requirements for the job, and he was permitted to interview pending resolution of his appeal.[3]

The DOC formed interview panels comprised of three panelists drawn from the pool of DOC Supervisors and Captains. Each panel used a predetermined set of questions to interview the applicants and, following the interview, the panel assigned a numerical score to each interviewee on a scale from 1-5. Once the panels had scored all of the applicants, the panels met with Dan Callahan, the Director of Human Resources at the DOC, and others, to select those applicants who would be hired for the PO I positions. A score of 3.5 or higher on the interview was required for consideration, though not every interviewee who scored 3.5 was selected for a PO I position. Neither Ms. McCardle, who scored 3.5, nor Mr. Balsamo, who scored below 3.5 (the record does not indicate Mr. Balsamo's score), were selected. Therefore, none of the Plaintiffs received offers for the PO I position. However, five other COs First Class, one Correctional Sergeant, and twelve Correctional

_____

[3] The record does not reflect whether a final decision as to whether Mr. Balsamo met the minimum requirements for the position was ever made, likely because the issue became moot once Mr. Balsamo did not receive a sufficiently high interview score to qualify him for the position.

Counselors did receive offers. In August 2004, all of the Plaintiffs, except for Ms. McCardle, received letters indicating that as a result of the merger between the DOC and the Board of Pardons and Parole, their durational positions would be terminated in October 2004 and they should therefore return to their former positions as COs. In addition, the letters informed Plaintiffs that their service in the higher class (e.g., CO First Class versus CO) would also end at that time. Ms. McCardle received notice that she would remain in her position as a Correctional Counselor.

In September 2004, Ms. McCardle filed a complaint with the Connecticut Commission on Human Rights and Opportunities as well as with the U.S. Equal Employment Opportunity Commission. This lawsuit was also filed in September 2004. The Court has allowed Plaintiffs to amend their initial Complaint [doc. # 1] on numerous occasions. Defendants' Motion for Summary Judgment [doc. # 86] is directed to Plaintiffs' Fifth Amended Complaint [doc. # 72].

## II.

The summary judgment standard is a familiar one. Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica College of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks omitted). "The substantive law governing the case will identify those facts that are material, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Bouboulis v. Transp.*

*Workers Union of Am.*, 442 F.3d 55, 59 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (alteration in the original)).

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the plaintiff, *see Anderson*, 477 U.S. at 255. If the moving party carries its burden, the party opposing summary judgment "may not rest upon . . . mere allegations or denials . . . ." Fed. R. Civ. P. 56(e). Rather, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* In short, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### III.

As a preliminary matter, the Court will address Plaintiffs' Motion to Strike [doc. # 108], which asks the Court to strike the exhibits attached to Defendants' Reply Brief [doc. # 106], including the supplemental Local Rule 56(a)(1) Statement. Because the Court did not consider any of the exhibits attached to the reply brief in reaching its decision, the Court will deny as moot Plaintiffs' Motion to Strike [doc. # 108].

### A. Due Process

Plaintiffs first allege that Defendants violated their substantive due process rights under the Fourteenth Amendment by arbitrarily denying them PO I positions. However, Plaintiffs' allegations fall well short of the conduct required to prove a substantive due process claim. The Second Circuit

has instructed that when challenging the actions of a government official, a plaintiff must show "not just that the action was literally arbitrary, but that it was arbitrary in the constitutional sense. Mere irrationality is not enough: 'only the most egregious official conduct,' conduct that 'shocks the conscience,' will subject the government to liability for a substantive due process violation based on executive action." *O'Connor v. Pierson*, 426 F.3d 187, 203 (2d Cir. 2005) (citations and internal quotation marks omitted) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833 (1998)); *see also Natale v. Town of Ridgefield*, 170 F.3d 258, 262 (2d Cir. 1999) (describing substantive due process violation as one "warranting the labels 'arbitrary' and 'outrageous'"). Because the Court concludes that no reasonable juror could find that Plaintiffs' allegations shock the conscience nor would a reasonable juror describe the allegations as "outrageous," the Court grants summary judgment to Defendants on this claim.

Plaintiffs also assert that the DOC's decision to terminate the positions of CO First Class and Correctional Sergeant violated their rights to procedural due process.[4] More specifically, Plaintiffs argue that Defendants failed to provide Plaintiffs with pre- and post-termination process in order to allow them to contest the termination of their CO First Class and Correctional Sergeant positions. As the Second Circuit has held, "[t]o determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, we must first identify the property interest involved. Next, we must determine whether the plaintiff received constitutionally adequate

---

[4] While Ms. McCardle originally pursued a procedural due process claim based on her reassignment to a different DOC office (although she maintained the same job title), her counsel informed the Court at oral argument that she was no longer pressing such a claim. Therefore, the Court did not consider Ms. McCardle's claim in its consideration of Plaintiffs' procedural due process claim.

process in the course of the deprivation." *O'Connor*, 426 F.3d at 196. Here, Plaintiffs can satisfy neither requirement.

Not every statutorily conferred benefit constitutes a property interest protected by the Constitution. "'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and 'more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)). Furthermore, property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Id*. "'In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship without cause.'" *Legg v. DellaVolpe*, 228 F. Supp. 2d 51, 61 (D. Conn. 2002) (quoting *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 967 (2d Cir.1988)).

Plaintiffs did not have a property interest in their positions as CO First Class and Correctional Sergeant. The record reflects a clear intent by the DOC to classify the positions as temporary, or durational, rather than permanent. This intent is uncontradicted by any documentary evidence provided by Plaintiffs.[5] Thus, when the DOC initially advertised the positions, it described them as "durational" positions that were part of an eighteen-month pilot program. *See* Mot. for Summ. J. [doc. # 86] Ex. 1, Attach. C-1 (Job Description of CO First Class); *id*. Ex. 1, Attachment C-2 (Job

_____

[5] Plaintiffs claim that because they worked in their durational positions beyond the positions' original expiration dates, *see* Mot. for Summ. J. [doc. # 86] Ex. 1, Attachment C-1 at 2 (CO First Class Job Description), or the extended expiration dates referenced in letters sent by the DOC to certain Plaintiffs, *see id*. Ex. 1, Attach. H, I, they had a protected property interest in their durational positions. Plaintiffs, however, have failed to point to any statute or contract that suggests that remaining in their temporary positions beyond the expiration date somehow converted their positions into permanent ones. *See S & D Maint. Co.,* 844 F.2d at 967.

8

Description of Correctional Sergeant). Furthermore, the official job postings for the positions stated explicitly that "all appointments will be *temporary* service in a higher class . . . until an evaluation of the classification can be made." *Id.* Ex 1, Attach. E-1, E-2 (emphasis added). Similarly, the letters sent by the DOC to congratulate selected applicants stated unequivocally: "This letter is to confirm that you have been selected for *Temporary* Service in a Higher Class . . . ." *See, e.g.*, *id*. Ex. 1, Attach. F-1 (emphasis added).

Finally, and importantly, state statutes and the DOC's policies support Defendants' contention that Plaintiffs did not have a property interest in their temporary positions. Connecticut General Statute § 5-209, which discusses temporary assignment to a position in a higher class, states expressly that "[s]ervice in a higher classification under this section shall not constitute permanent status in such class." In addition, the DOC's workplace policy describing temporary service in a higher class concludes by noting that "[u]pon completion of [a Temporary Service in a Higher Class] assignment, all employees will be returned to their prior permanent class . . . ." *Id.* Ex. 6, Attach. C-2 (General Letter No. 29, dated May 25, 2000); *see also id.* Ex. 6, Attach. C-1 (General Letter 215, dated December 24, 1992).

Plaintiffs assert three rationales for why they held a property interest in their durational positions. First, Plaintiffs allege that they were told by various DOC managers that their ranks were permanent or that they would be "grandfathered" into the new PO I positions. *See* Mem. in Opp'n to Summ. J. [doc. # 98] at 20. However, mere verbal representations made by DOC employees cannot establish a property interest when such representations contradict state law or regulations. *See Baden v. Koch*, 638 F.2d 486, 492 (2d Cir.1980) ("[M]utual understandings and customs could not create a property interest for purposes of due process when they are contrary to the express

provisions of regulations and statutes."), *cited with approval in McMenemy v. City of Rochester*, 241 F.3d 279, 287 (2d Cir. 2001).

Next, Plaintiffs assert that durational positions are limited to a term of six months, after which point the position becomes permanent. *See* Mot. in Opp'n to Summ. J. [doc. # 98] at 20. The evidence cited by Plaintiffs to support this assertion, however, provides no support. Plaintiffs cite the collective bargaining agreement between the State and the corrections officers' union. However, the relevant section pertaining to durational employees provides that durational employees will "be covered by this Agreement after six (6) months of continuous service." Mot. in Opp'n to Summ. J. [doc. # 98] Ex. B (Corrections [NP-4] Bargaining Unit Contract). The contract refers solely to when durational employees will be covered under the contract and makes no reference to durational positions becoming permanent at any time. In fact, the contract explicitly states that "due to the nature of the durational appointment, a durational employee cannot be guaranteed continued employment beyond the termination date of the appointment." *Id.*

Finally, Plaintiffs argue that even if their positions were durational, they nonetheless maintained a property interest in the ranks that are associated with the durational positions. This creative argument is undermined, however, by the plain language of § 5-209 of the Connecticut General Statutes, which quite clearly states that temporary assignment in a higher class "shall not constitute permanent status in such class." Thus, the Court concludes that Plaintiffs' positions were, and remained at all times, durational positions, and that Plaintiffs held no property interest in those durational positions.

Even if the Court were wrong in this regard, the Court finds that Defendants provided sufficient process to Plaintiffs to satisfy their constitutional obligations under the Due Process

Clause. To determine what process Plaintiffs were due under the Constitution, the Court must consider the following factors: "(1) the private interest at stake, (2) the risk of an erroneous deprivation of that interest through the procedures used and the probable value (if any) of alternative procedures; (3) the government's interest, including the possible burdens of alternative procedures." *O'Connor*, 426 F.3d at 197 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)). In *Ciambriello v. County of Nassau*, the Second Circuit held that a county employee who faced demotion for reasons unrelated to merit or any disciplinary problems was entitled to "notice of the charges against him and the opportunity to be heard before demotion." 292 F.3d 307, 321 (2d Cir. 2002).

Here, on September 17, 2004, the DOC sent a letter to each Plaintiff whose durational positions would expire,[6] informing them that as a result of the merger between the DOC and the Board of Pardon and Parole,

> the durational positions . . . will expire effective October 1, 2004 and will not be extended.

> Based on this, and in accordance with our understanding with the NP-4 union concerning assignments after expiration of the Community Enforcement pilot program, your temporary service in a higher class status will end effective September 30, 2004 and you will be returned to your previous permanent position.

Mot. for Summ. J. [doc. # 86] Ex. 1, Attachs. N-1 to N-9. Plaintiffs acknowledge that they received this notice, which they characterize as a notice of their "demotion," two weeks before the change discussed in the letter took effect. Yet, none of the Plaintiffs filed a grievance or otherwise responded to the letters in any way.[7] As this Court has held in a previous procedural due process

---

[6] Ms. McCardle did not hold a durational position and as a result, she did not receive such a letter.

[7] Plaintiffs cite a grievance filed by Ms. Lavoie-Francisco on August 31, 2004. *See* Mot. in Opp'n to Summ. J. [doc. # 98] Ex. VV. However, Ms. Lavoie-Francisco's grievance did not concern

case involving the termination of a governmental position, "a pre-termination hearing is required only when, first, the employee alleges that the reduction in force was pretextual and second, the employee demonstrates that she *timely requested a pre-termination hearing*." *Pulaski v. Stratford Bd. of Educ.*, No. 3:04CV2015 (MRK), 2006 WL 2361724, at *5 (D. Conn. Aug. 15, 2006) (emphasis added) (citing *Dwyer v. Regan*, 777 F.2d 825, 833 (2d Cir. 1985)). Because Plaintiffs did not request a pre-termination hearing, the DOC was not required to provide one in order to satisfy Plaintiffs' rights to procedural due process.

Plaintiffs also had available to them detailed post-deprivation remedies under the terms of their collective bargaining agreement. Yet again, however, Plaintiffs failed to pursue those remedies. As the Court noted in *Pulaski*, the availability of an adequate grievance process pursuant to a collective bargaining agreement satisfies the post-termination requirements of the Procedural Due Process Clause. *See Pulaski*, 2006 WL 2361724, at *5 (citing *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003) ("Courts have held that such post-deprivation [grievance] procedures, providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process.")); *see also O'Connor*, 426 F.3d at 198 ("[Collective bargaining agreement]-

---

the expiration of her durational position or her return to her CO position, likely because she had not yet received notice of this change when she filed her grievance. Instead, Ms. Lavoie-Francisco requested in her grievance that she be "upgraded to a Correctional Counselor." *Id.* While Ms. Lavoie-Francisco, in her interrogatory responses, claims that she later amended her grievance to include a claim related to her durational position, she has not provided the Court with the dates of the claimed amendments or any record of the amendments, nor do Defendants have any knowledge of such amendments. Because Ms. Lavoie-Francisco's bald assertions cannot create a genuine issue of material fact, *see Page v. Lantz*, No. 3:05CV1271 (MRK), 2007 WL 1834519, at *2 (D. Conn. June 25, 2007) ("[A] 'bald assertion, completely unsupported by evidence,' cannot overcome a properly supported motion for summary judgment.") (quoting *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir.1991)), the Court concludes that Ms. Lavoie-Francisco's grievance did not concern the termination of her durational position.

mandated grievance procedures are routinely (though not always) held to provide adequate post-deprivation process.").

Plaintiffs have not raised any deficiencies in the grievance process available to them, except for Plaintiffs' assertion during oral argument that the grievance procedure was inadequate because the union would have an "inherent conflict of interest" in having to favor one employee over another. Putting aside for the moment whether such an argument would ever have merit, the Court notes that the collective bargaining agreement at issue in this case expressly allowed employees to pursue grievances on their own, without union representation. *See* Mot. for Summ. J. [doc. # 86] Ex. 1, Attachment Q. Plaintiffs' counsel responded that it was too much to expect aggrieved employees to pursue grievances on their own without union assistance. Were the Court to adopt such an extreme and unfounded position, it would render any process provided insufficient unless an employer took it upon itself to grieve itself for the employee or to hire outside counsel to represent an aggrieved employee who did not trust his or her union. The Due Process Clause does not require such measures. *See Harhay*, 323 F.3d at 213. Instead, the Court concludes that providing employees with advance notification of termination and an opportunity for a pre-termination hearing, in conjunction with a process for employees to file post-deprivation grievances, satisfies the procedural due process requirements of the Fourteenth Amendment.

## B. Equal Protection and Title VII – Gender Discrimination

Both Ms. McCardle and Ms. Lavoie-Francisco (but no other Plaintiff) allege that Defendants did not select them for the PO I positions based upon their gender, in violation of the Equal Protection Clause. Ms. McCardle also brings a Title VII claim relying on the same facts.

The Second Circuit has held that gender-based discrimination may be actionable under 42 U.S.C. § 1983 as a violation of the Equal Protection Clause. *See Kern v. City of Rochester*, 93 F.3d 38, 43 (2d Cir.1996). "Once action under color of state law is established, the analysis for such claims is similar to that used for employment discrimination claims brought under Title VII, the difference being that a § 1983 claim, unlike a Title VII claim, can be brought against individuals." *Demoret v. Zegarelli*, 451 F.3d 140, 149 (2d Cir. 2006) (citing *Feingold v. New York*, 366 F.3d 138, 159 & n.20 (2d Cir. 2004) and *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 123 (2d Cir. 2004)).

Thus, courts analyze gender-based disparate treatment equal protection claims under the familiar burden-shifting framework developed under Title VII in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Ms. McCardle and Ms. Lavoie-Francisco must first establish a *prima facie* case by demonstrating that: (1) they are members of a protected class; (2) they were qualified for the PO I position; (3) they suffered an adverse employment action; and (4) the action occurred under conditions giving rise to an inference of discrimination. *See Demoret*, 451 F.3d at 151. If Ms. McCardle and Ms. Lavoie-Francisco establish their *prima facie* case, "the burden shifts to the defendant[s] . . . to provide a legitimate, non-discriminatory reason for the action. If the defendant[s] make[] such a showing, the burden shifts back to the plaintiff[s] to prove discrimination, for example, by showing that the employer's proffered reason is pretextual." *Id.* (citations omitted) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-04). For purposes of considering the summary judgment motion, the Court will assume that Ms. McCardle and Ms. Lavoie-Francisco have both demonstrated a *prima facie* case, and the Court will therefore focus on the last two prongs of the *McDonnell Douglas* framework.

With respect to Ms. McCardle, Defendants concede that Ms. McCardle met the minimum qualifications for the PO I position and thus qualified for an interview. Both parties agree that Ms. McCardle received a score of 3.5 from the interview committee and that other individuals with scores of 3.5 were selected for the PO I positions. Defendants assert that they did not select Ms. McCardle from among the interviewees who received a score of 3.5 because one of Ms. McCardle's female interviewers, Ms. Guglielmi, indicated on her interview sheet that Ms. McCardle "seemed hesitant about carrying and training w/ weapon." Mot. for Summ. J. [doc. # 86] Ex. 7, Attach. C. Defendants, therefore, have offered a non-discriminatory rationale for denying Ms. McCardle the PO I position, and the burden shifts back to Ms. McCardle to produce admissible evidence that would permit a reasonable jury to conclude that the rationale offered by Defendants is pretextual and that the true reason for denying her the position was based on her gender. The Court believes that Ms. McCardle has shouldered that burden.

To begin with, Ms. McCardle denies that she ever expressed any hesitation during the interview. Ms. McCardle also alleges that Mr. Sosa, her supervisor who was also on the panel of interviewers, discriminated against women in the New Haven office. Specifically, Ms. McCardle claims that on two occasions, Mr. Sosa told her that "[t]here are too many women working in this office." Statement of Material Facts [doc. # 98-2] para. 158. Ms. McCardle further alleges that Mr. Sosa targeted women for inappropriate discipline as compared to similarly situated men. *Id*. para. 161. Also significant to her claim, Ms. McCardle notes that Mr. Sosa was one of three people on the interview committee who interviewed all of the candidates and therefore, she asserts, his opinion carried greater weight as to which candidates would be selected. *Id*. para. 252. To bolster her

claims, Ms. McCardle observes that no women were selected for the PO I position in the New Haven office, where Mr. Sosa was a supervisor and where Ms. McCardle applied to work.

Defendants respond by pointing out that women were selected for the PO I position in other cities and that a woman was selected as an alternate candidate for the New Haven office, though Defendants concede that no women were selected as primary candidates for the New Haven office. Because the Court, at this stage, must draw all reasonable inferences in the light most favorable to Ms. McCardle, the Court concludes that there are genuine issues of material fact regarding whether Mr. Sosa interfered with Ms. McCardle's selection for the PO I position in New Haven and whether any such interference was based on Ms. McCardle's gender. The Court hastens to add that Ms. McCardle will have a difficult burden at trial given the minimal evidence suggesting that Mr. Sosa possessed significant influence over the hiring decisions of the other panel members and the fact that Mr. Sosa participated in the hiring of women for offices other than New Haven. Nonetheless, those are issues for a jury to weigh, not this Court.

The Court will also allow Ms. McCardle's Title VII claim to proceed to trial as it relies on the same alleged facts. However, not all named Defendants are appropriate for Ms. McCardle's gender discrimination claims. For one, individuals cannot be held liable under Title VII. *See Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 221 (2d Cir. 2004). Therefore, the only viable defendant for Ms. McCardle's Title VII claim is her employer, the State of Connecticut. As for her equal protection claim, Ms. McCardle alleges that the members of the interview panel were responsible for selecting candidates for the PO I position. The only member of the panel named as a defendant is Mr. Sosa. Ms. McCardle also alleges that Commissioner Lantz has promoted

"policies and practices" that allowed the gender discrimination to occur.  The Second Circuit has recently held that

> [t]he personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the violation, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal v. Hasty*, Docket No. 05-5768-CV (L), 2007 WL 1717803, at *6 (2d Cir. June 14, 2007). Because the Court finds that a material issue of fact exists as to whether Commissioner Lantz was liable in her supervisory capacity over Mr. Sosa, the Court will allow Ms. McCardle's equal protection claim to proceed against Commissioner Lantz.[8]  Therefore, the Court will allow Ms. McCardle's Title VII claim to proceed against the State of Connecticut and Ms. McCardle's gender-based equal protection claim to proceed against Mr. Sosa and Commissioner Lantz, but will grant summary judgment to all other Defendants on Ms. McCardle's Title VII and gender-based equal protection claims.

By contrast, the Court concludes that Ms. Lavoie-Francisco cannot sustain her equal protection claim against any Defendant.  Ms. Lavoie-Francisco relies on the same set of facts as Ms. McCardle, in addition to the allegation that Mr. Sosa made a gender-based derogatory remark toward her.  However, unlike Ms. McCardle, Ms. Lavoie-Francisco was not selected for an interview, and therefore was never interviewed by Mr. Sosa nor considered by the interview committee.  Plaintiffs

---

[8] The Court grants summary judgment to the State on Ms. McCardle's gender-based equal protection claim since a state may not be sued under 42 U.S.C. § 1983.  *See Huminski v. Corsones*, 396 F.3d 53, 70 (2d Cir. 2005) ("[N]either a State nor its officials acting in their official capacities are 'persons' under [42 U.S.C.] § 1983.") (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

do not appear to contest Defendants' representation that the decisions regarding who would be interviewed were made by two females–Ms. Abele and Ms. Guglielmi. The record does not contain any evidence indicating that Mr. Sosa lobbied or put any pressure on either Ms. Guglielmi or Ms. Abele not to select Ms. Lavoie-Francisco for an interview.

Faced with this absence of evidence, during oral argument, Ms. Lavoie-Francisco's counsel asserted that Mr. Sosa had intervened on behalf of other candidates and that Ms. Lavoie-Francisco's rights to equal protection were violated because Mr. Sosa did not intervene on her behalf as well. But her counsel conceded that Ms. Lavoie-Francisco never requested that Mr. Sosa intervene on her behalf, and therefore, Mr. Sosa never declined to intervene on behalf of Ms. Lavoie-Francisco. In those circumstances, it is difficult in the extreme to understand how Mr. Sosa should be faulted for violating Ms. Lavoie-Francisco's constitutional rights. *Cf. Alphonse v. Conn. Dept. of Admin. Servs.*, No. Civ. 3:02CV1195 (MRK), 2004 WL 904076, at \*5 (D. Conn. Apr. 21, 2004) (citing *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir.2003)) (explaining that in order to bring a cognizable "failure to promote" claim, "a plaintiff must allege that she or he applied for a specific position or positions and was rejected therefrom"). The Court will therefore grant summary judgment to Defendants on Ms. Lavoie-Francisco's gender-based equal protection claim.

### C.    Equal Protection – Class of One

Plaintiffs' final claim is an *Olech*-style "class-of-one" equal protection claim, in which Plaintiffs allege that Defendants irrationally selected candidates less qualified than Plaintiffs for the PO I positions. *See Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

The Second Circuit has yet to state definitively whether an *Olech* claim may proceed in the public employment context. *See Ferguson v. Rochester Sch. Dist.*, No. 04-CV-6414L, 2007 WL

1169183, at *3 n.4 (W.D.N.Y. Apr. 19, 2007). Indeed, recently, after considering the issue in some depth, the Ninth Circuit became the first circuit court to hold that "the class-of-one theory equal protection theory is inapplicable to decisions made by public employers with regard to their employees." *Engquist v. Or. Dep't of Agric.*, 478 F.3d 985, 996 (9th Cir. 2007). *But see Engquist*, 478 F.3d at 993 (citing cases from other circuits that applied *Olech* to claims involving public employment: *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260-61 (6th Cir. 2006); *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006); *Whiting v. Univ. of Miss.*, 451 F.3d 339, 348-50 (5th Cir. 2006); *Levenstein v. Salafsky*, 414 F.3d 767, 775-76 (7th Cir. 2005); *Campagna v. Mass. Dep't of Envtl. Prot.*, 334 F.3d 150, 156 (1st Cir. 2003); *Bartell v. Aurora Pub. Schs.*, 263 F.3d 1143, 1148-49 (10th Cir. 2001)).

Despite the number of circuits that have applied *Olech* to public employment cases, many of the arguments advanced by the Ninth Circuit in *Engquist* have considerable merit. For example, the Ninth Circuit noted that "[t]he Supreme Court has always assumed that 'the government as employer indeed has far broader powers than does the government as sovereign.'" *Engquist*, 478 F.3d at 994 (quoting *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (O'Connor, J., plurality opinion)). Moreover, in contrast to the paradigmatic class-of-one case–where a public official with improper motive subjects a private citizen to undue regulation or sanction–"when a public employee is subjected to unequal treatment at work for arbitrary reasons, the need for federal judicial review under equal protection is especially thin given the number of other legal protections that public employees enjoy." *Id.* at 995 (internal quotation marks omitted). Finally, the Ninth Circuit warned

that "[a]pplying equal protection to forbid arbitrary or malicious firings of public employees would completely invalidate the practice of public at-will employment." *Id.* at 995.[9]

While the Second Circuit has not definitively ruled on whether *Olech* applies in the public employment context, in *Neilson v. D'Angelis*, 409 F.3d 100 (2d Cir. 2005), the Second Circuit discussed *Olech* in the context of a public employment case and appeared to assume that such a claim was viable. Though in that particular case, the court reversed a jury verdict and held that the plaintiff had failed to meet the demanding standards for succeeding on an *Olech* claim. Nevertheless, the Second Circuit's discussion of *Olech* in *Nielson* suggests that the Second Circuit intends *Olech* to apply in the public employment context.

That said, the Second Circuit has left no doubt that an *Olech* plaintiff must meet a high threshold to move beyond summary judgment. Specifically, for a plaintiff to demonstrate that he or she was treated differently from similarly situated individuals in an irrational manner, in violation of the Fourteenth Amendment, the plaintiff must demonstrate that he or she is "prima facie identical" to the comparators. *Neilson*, 409 F.3d at 105. Furthermore, a plaintiff must show that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

---

[9] Plaintiffs' counsel suggested during oral argument that employment decisions based on *any* subjective criteria were challengeable under *Olech*, in which case a jury would decide whether the employer's justification was rational or not. Such a suggestion is untenable. Government employers must be allowed to apply at least some subjective criteria in selecting candidates for government positions lest the Ninth Circuit's warning come true and federal courts become transformed into super-personnel departments.

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citing *Neilson*, 409 F.3d at 105); *see also RJB Props., Inc. v. Bd. of Educ. of Chicago*, 468 F.3d 1005, 1010 (7th Cir. 2006) ("The plaintiff's evidence must be such that it allows a reasonable jury to eliminate any reasonably conceivable state of facts that could provide a rational basis for the classification.") (internal quotation marks omitted); *Blackhawk Sec., Inc. v. Town of Hamden*, No. 3:03CV2101 (MRK), 2005 WL 1719918, at *3-*4 (D. Conn. July 22, 2005) (discussing the high standard of similarity required for *Olech* claims).

The Court has little difficulty concluding that no reasonable juror could determine that the non-interviewed Plaintiffs meet the requirements of *Neilson*. Plaintiffs contend that they were improperly denied interviews because Ms. Abele and Ms. Guglielmi erroneously concluded that Plaintiffs failed to meet the minimum job requirements for the PO I position. For these Plaintiffs, there is no issue of any subjective assessment, since they were never interviewed. The parties agree that the job description for the PO I position stated that applicants were required to have six years of experience in case management activities in parole, probation, criminal justice, law enforcement, rehabilitation counseling, or social work in a correctional or community setting. Applicants also received credit, however, for college training in criminal justice, law enforcement, social work, psychology, human resources, or a related field on the basis of fifteen semester hours equaling one-half year of experience to a maximum of four years for a Bachelor's degree.

Plaintiffs assert that Ms. Abele and Ms. Guglielmi selected individuals less qualified than themselves for interviews, in violation of the Equal Protection clause. However, in asserting that the candidates selected for interviews were less qualified, Plaintiffs rely on factors that the evidence shows were not considered by Ms. Abele and Ms. Guglielmi. Plaintiffs assert, for example, that they

received higher job evaluations throughout their careers and that they had no disciplinary history or criminal records in contrast to other applicants who were afforded interviews. While these assertions may be true (the Court need not and will not make such a determination), the record does not reflect that Ms. Abele and Ms. Guglielmi considered job evaluations, disciplinary histories, or criminal records when deciding who should be interviewed. Instead, the record shows that Ms. Abele and Ms. Guglielmi focused solely on whether applicants had sufficient work and/or educational experience to warrant an interview.

Therefore, to prevail on their *Olech* claim, Plaintiffs must produce evidence that would permit a reasonable jury to decide that they had experience and/or education that was *prima facie* identical in all material respects to those selected for interviews. That Plaintiffs have not done. In their briefs and in their Statement of Material Facts [doc. # 98-2],[10] Plaintiffs make reference to fifty-nine comparators–individuals selected for interviews who were allegedly unqualified according to Plaintiffs.[11] Focusing on the criteria that Ms. Abele and Ms. Guglielmi used for their selections, it is immediately apparent that many of the comparators had over six years of relevant work experience and therefore clearly met the minimum experience requirements for the PO I position. For the

_____

[10] In describing the alleged comparators in their Statement of Material Facts, Plaintiffs cite only to their own interrogatory responses rather than documentary evidence. *See* Plaintiffs' Statement of Material Facts [doc. # 98-2] paras. 306-63. Moreover, the cited interrogatory responses do not themselves cite to any documentary evidence. However, during oral argument, Plaintiffs' counsel represented to the Court that the interrogatory responses were based on the interview sheets and applications that had been submitted to the Court. *See, e.g.*, Mot. for Summ. J. [doc. # 86] Ex. 7, Attachs. F-1 to F-56. The Court has reviewed the applications and interview sheets and has considered Plaintiffs' interrogatory responses in the context of the underlying documentary evidence.

[11] In order to determine whether Plaintiffs were indeed *prima facie* identical to the alleged comparators, the Court scrutinized the applications of the fifty-nine comparators as well as additional interview forms. The prospect of having to conduct an even broader comparator analysis in future cases lends further weight to the concerns expressed by the Ninth Circuit in *Engquist*.

remaining applicants, their applications included (or were amended to include) representations that they had sufficient academic credits to surpass the six-year qualification requirement. *See generally* Mot. for Summ. J. [doc. # 86] Ex. 7, Attachs. F-1 to F-56 (completed application forms for comparators).

By contrast, none of the non-interviewed Plaintiffs appears to have six years of work experience in a qualifying job, as defined in the PO I job description. *See id.* Ex. 5, Attachs. E-M (completed applications of Plaintiffs). Furthermore, none of the Plaintiffs appears to have sufficient relevant (as determined by the job posting) academic credits to meet the minimum six-year requirement. That is not to say that Plaintiffs' academic credits were summarily ignored. For example, Mr. Wales was given thirty-three units of academic credit, which was equivalent to a little over one year of work experience. However, Mr. Wales received credit for only two years and seven months of qualifying work experience and thus did not meet the six-year requirement.

Plaintiffs point to other specific examples of comparators who they believe exemplify the irrationality of Defendants' actions. For example, Plaintiffs state that "Defendant Abele approved [Mr.] Sarsfield for appointment on the basis of his studies in the field of 'business' although studies in that field were not considered related to the position of Parole Officer 1." Statement of Material Facts [doc. # 98-2] para. 31 (citing Mot. in Opp'n to Summ. J. [doc. # 98] Ex. T). Plaintiffs' bald assertions, however, are refuted by documents Plaintiffs themselves provided to the Court. For example, a July 18, 2004 email to Ms. Abele expressly notes that Mr. Sarsfield received no credit for his business degree. Mot. in Opp'n to Summ. J. [doc. # 98] Ex. S. Rather, as explained in Ms. Guglielmi's affidavit, Mr. Sarsfield had five years and one month of relevant work experience in addition to twenty-four credits of work from his Master's degree in sociology and eight credits for

relevant course work from his undergraduate degree (including an introduction to sociology course). This totaled thirty-two units, for which Mr. Sarsfield was credited with one year of additional experience, thereby placing him above the six-year minimum requirement. *See* Mot. for Summ. J. [doc. # 86] Ex. 7 at 8 (Aff. of Maria Guglielmi); *id.* Ex. 7, Attach. F-25 (Mr. Sarsfield's application and academic transcript).

Plaintiffs also spend a considerable amount of time alleging that Marvin Anderson received more favorable treatment than Plaintiffs.[12] For example, Ms. Lavoie-Francisco complains that Mr. Anderson, among others, was given credit for his time as a trainee while Ms. Lavoie-Francisco was not, despite, according to Ms. Lavoie-Francisco, her repeated requests to receive such credit. *See* Statement of Material Facts [doc. # 98-2] para. 304. Ms. Lavoie-Francisco admitted, however, that even if she was credited for such work, "she would have had 5 ½ years field experience." *Id*. Because Ms. Lavoie-Francisco's educational background was in "a non-related field," Mot. for Summ. J. [doc. # 86] Ex. 7, Attach. L (Letter to Ms. Lavoie-Francisco), she still would not have had the required six years of experience. Ms. Lavoie-Francisco was not, therefore, similarly situated to Mr. Anderson as the Second Circuit has defined that term.

The Court recognizes that the analysis just provided regarding Mr. Sarsfield and Mr. Anderson necessarily is fact-dependent. And, of course, disputed issues of fact are for the jury to decide. The Second Circuit, however, has stated that a court may grant summary judgment "on the

---

[12] Plaintiffs also assert that Mr. Anderson should not have received work experience credit for his work as a Christian counselor because he did not list the job on his resume. However, in her deposition, Ms. Tweeddale, a DAS Personnel Analyst who served as a liaison to the DOC, explained that she based her work experience calculations on the signed application form, in which Mr. Anderson did, in fact, list his experience as a Christian counselor. Mr. Anderson's application confirms this fact *See* Mot. for Summ. J. [doc. # 86] Ex. 7, Attach. F-27 (Mr. Anderson's application).

basis of lack of similarity of situation . . . where no reasonable jury could find that the persons to whom the plaintiff compares itself are similarly situated." *Clubside , Inc.*, 468 F.3d at 159. Here, Defendants have satisfied that standard. The Court finds that none of the non-interviewed Plaintiffs possessed the requisite experience for the PO I position, while the evidence shows that the alleged comparators did.

The Court concludes that no reasonable jury could find from the evidence presented that the non-interviewed Plaintiffs are *prima facie* identical to those who were interviewed, as is required to pursue an *Olech* class-of-one equal protection claim. While Plaintiffs may have been "superior" applicants based on their own preferred criteria, the role of the Court is not to supplant Defendants' hiring decisions with its own, but rather to determine if Defendants treated individuals who are *prima facie* identical in an irrationally different manner. The evidence cannot support such a claim. Therefore, the Court grants summary judgment to Defendants on the *Olech* equal protection claims of all non-interviewed Plaintiffs.

Ms. McCardle and Mr. Balsamo are the only Plaintiffs who received interviews, and the Court concludes that it must deny Defendants' Motion for Summary Judgment on the class-of-one equal protection claims of these Plaintiffs. The interview committee gave Ms. McCardle a score of 3.5, which was high enough to qualify her for a PO I position. Ms. Guglielmi stated that Ms. McCardle was not selected from among the other candidates who scored 3.5 because Ms. Guglielmi believed that Ms. McCardle "seemed hesitant" when responding to the question concerning whether she would be willing to carry a firearm. *See* Mot. for Summ. J. [doc. # 86] Ex. 7 (Aff. of Maria Guglielmi). None of Ms. McCardle's other interviewers noted any such hesitation, and Ms. McCardle herself denies that she was hesitant. *See* Mot. for Summ. J. [doc. # 86] Ex. 7, Attach. C

(interviewers' notes).  Furthermore, Ms. McCardle cites to the interview records of two other candidates whom Defendants selected for PO I positions.  Interviewers noted that Donna Henry was "concerned about carrying a weapon."  Mot. in Opp'n to Summ. J. [doc. # 98] Ex. JJ at 1.  Similarly, an interviewer wrote that Mattie Johnson "personally does not like weapons but would do what job requires.  Very hesitant."  *Id*. Ex. KK at 1.  Ms. Johnson also received a score of 3.5 from the interview panel.  *See* Mot. for Summ. J. [doc. # 86] Ex. 7, Attach. E.  The evidentiary record therefore casts some doubt on Defendants' explanation for why they did not select Ms. McCardle, and Defendants have not offered any other reason for distinguishing Ms. McCardle from Ms. Henry or Ms. Johnson.[13]  In sum, Ms. McCardle has pointed to individuals who appear, based on the record before the Court, to be *prima facie* identical to Ms. McCardle, but, unlike Ms. McCardle, were selected for the PO I position.  Because Ms. McCardle has raised genuine issues of material fact regarding the rationality of the DOC's hiring decisions, the Court will allow Ms. McCardle's class-of-one equal protection claim to proceed.

In Mr. Balsamo's case, the Court simply faces a lack of evidence, rather than a contradictory explanation.  Defendants assert that they did not select Mr. Balsamo for the PO I position because he received a score of less than 3.5.  However, the record provides no indication of Mr. Balsamo's score–for example, whether it was 3.4 or 1.0; nor does the record reflect how the interview panel arrived at whatever score they awarded Mr. Balsamo.  The only relevant evidence before the Court

_____

[13] Defendants attempted to distinguish Ms. McCardle from Ms. Henry and Ms. Johnson by introducing additional facts into the record in a supplemental Local Rule 56(a)(1) Statement filed with their reply brief.  *See* Supplemental Local Rule 56 Statement [doc. # 106-2] paras. 180, 182, 183.  Even if the Court were to consider facts introduced in a supplemental Rule 56 statement filed with a reply brief, which it has not done here, Defendants' Reply Brief [doc. # 106] contains no reference to the additional facts.  Therefore, the briefs before the Court contain no explanation for the disparate treatment of Ms. McCardle as compared to Ms. Henry and Ms. Johnson.

are the interviewers' comments, which the Court has reviewed and which appear to contain only positive references to Mr. Balsamo. For example, one interviewer noted that Mr. Balsamo had "good knowledge of Correction practices" and that he had "good responses." Mot. in Opp'n to Summ. J. [doc. # 98] Ex. CCC at 5. Based on the record before it, and without an explanation or other evidence proffered by Defendants, the Court is unable to discern why Mr. Balsamo would receive a lower score than other apparently similarly situated individuals. In short, Mr. Balsamo has shown himself to be *prima facie* identical to other candidates and has cast doubt upon the rationality of his interview score.

Defendants assert that even if the Court permits Ms. McCardle's and Mr. Balsamo's class-of-one equal protection claims to proceed, Commissioner Lantz, Ms. Tweeddale, and Ms. Abele were not personally involved and therefore should be granted summary judgment. *See* Reply to the Motion for Summary Judgment [doc. # 106] at 22-23. For the same reasons as those stated above regarding the gender-based equal protection claim, the Court will allow the claims to proceed against Commissioner Lantz. In addition, the Court will allow the claims to proceed against Ms. Abele as she seemed personally involved in approving applicants for the PO I position. *See* Mot. in Opp'n to Summ. J. [doc. # 98] Ex. T (Letter from Ms. Abele). In responding to Defendants' assertions regarding lack of personal involvement, Plaintiffs stated that Ms. Tweeddale, "*after this suit was filed*, personally approved the promotions of several applicants less qualified than the plaintiffs McCardle and Balsamo." Plaintiffs' Supplemental Brief in Opposition to Motion for Summary Judgment [doc. # 112] at 13 (emphasis added). Ms. Tweeddale cannot be held liable to Plaintiffs for hiring decisions made after those regarding Plaintiffs. Therefore, the Court grants summary

judgment to Ms. Tweeddale on Ms. McCardle and Mr. Balsamo's class-of-one equal protection claim.

While the record before the Court provides insufficient explanation to grant summary judgment to Defendants with respect to both Ms. McCardle and Mr. Balsamo, the Court recognizes that there could be countless reasons, both objective and subjective, for the Defendants' hiring decisions. To overcome an *Olech*-style equal protection claim, Defendants need only provide a rational explanation for their decision, which the Court recognizes is an intentionally low standard. Here, however, Defendants have provided the Court with only two explanations for their decisions–Ms. McCardle's alleged hesitancy about using weapons and Mr. Balsamo's sub-3.5 interview score. In both cases, by comparing themselves to individuals who appear to be *prima facie* identical but who received different treatment, Ms. McCardle and Mr. Balsamo have successfully cast sufficient doubt on the rationality of Defendants' hiring decisions to survive summary judgment.

## IV.

In sum, the Court DENIES AS MOOT Plaintiffs' Motion to Strike [doc. # 108]. The Court also GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment [doc. # 86]. The Court enters the following orders:

1.     The Court GRANTS summary judgment to all Defendants on the substantive and procedural due process claims of all Plaintiffs.

2.     The Court GRANTS summary judgment to all Defendants on Ms. McCardle's Connecticut Fair Employment Practices Act claim.

3.     The Court GRANTS summary judgment to all Defendants on Ms. Lavoie-Francisco's gender-based equal protection claim.

28

4.     With respect to Ms. McCardle's gender-based equal protection claim, the Court GRANTS Summary Judgment to all Defendants, except Mr. Sosa and Commissioner Lantz, and with respect to Ms. McCardle's Title VII claim, the Court GRANTS summary judgment to all Defendants, except the State of Connecticut.

5.     The Court also GRANTS summary judgment to all Defendants as to the class-of-one equal protection claims of all Plaintiffs except Ms. McCardle and Mr. Balsamo.  With respect to Ms. McCardle's and Mr. Balsamo's class-of-one equal protection claims, the Court GRANTS summary judgment to Ms. Tweeddale.

Therefore, the claims remaining in this case, for which the Court has DENIED summary judgment, are as follows:  Ms. McCardle's gender-based equal protection claim against Mr. Sosa and Commissioner Lantz; Ms. McCardle's Title VII claim against the State of Connecticut; and the class-of-one equal protection claims of Ms. McCardle and Mr. Balsamo against all Defendants, except for Ms. Tweeddale.

By separate order the Court will issue a calendar setting the trial date and the date for filing a Joint Trial Memorandum.

IT IS SO ORDERED.

/s/ _____Mark R. Kravitz_____
United States District Judge

**Dated at New Haven, Connecticut: <u>July 6, 2007.</u>**